**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0708-24

ERIKA A. BUTLER and RHEIN
REALTY CORPORATION,

      Plaintiffs-Respondents,

v.

ADVANCE REALTY
DEVELOPMENT, LLC,

      Defendant,

and

PARAMUS NORTHBOUND
PROPERTY, LLC, and DEKA
USA PROPERTY FOUR LP,

      Defendants-Appellants.

_____

Argued May 6, 2026 – Decided August 5, 2026

Before Judges Currier, Smith and Jablonski.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-1540-20.

Cory Mitchell Gray argued the cause for appellants (Greenberg Traurig LLP, attorneys; Cory Mitchell Gray, on the briefs).

Thomas W. Randall argued the cause for respondents (Randall Randall LLC, attorneys; Thomas W. Randall, on the brief).

PER CURIAM

Defendants Paramus Northbound Property, LLC (PNP) and DEKA USA Property Four, LP (DEKA) appeal from the trial court's order awarding real estate brokerage commissions to plaintiffs Erika A. Butler and Rhein Realty & Management Corp (Rhein). For the reasons which follow, we affirm.

I.

A.

Background

Plaintiffs sued PNP and DEKA seeking real estate brokerage commissions relating to commercial property located in Paramus, New Jersey ("the property").

Butler, a licensed New Jersey real estate broker, currently serves as principal and owner of Rhein. In February 1984, Rhein entered into a brokerage agreement with a trust that owned the property, Emil Buehler Perpetual Trust, acquiring exclusive rights to offer the property for sale or lease and to negotiate

2

renewals of existing leases on the property, initially for a term of ten years, with extensions and amendments possible through agreements in writing. Paragraph 6 of the brokerage agreement, outlining commissions, provided:

> If the property is sold or leased or existing lease renewed through the efforts of [Rhein] . . . , or in the event that the property is sold or leased while this [a]greement is in force, by [Buehler, Inc.] or anyone else, [Rhein] will be entitled to a commission in an amount in accordance with the following rates:
>
> (a) New Jersey properties; not less than six percent (6%) of the total sales price or gross rental, except for the Mahwah property, where the commission shall be four percent (4%);
>
> . . . .

The brokerage agreement was repeatedly extended, with a written amendment in January 2000, and a termination date set for November 13, 2010. All other provisions remained unchanged. Throughout the duration of the brokerage agreement, Rhein received commissions for leases and renewals, including retail store tenancies for PetSmart, Borders Book Shop (Borders), and DSW Designer Shoe Warehouse (DSW).

In November 2011, the Buehler trust terminated the brokerage agreement with Butler and Rhein, electing a new exclusive manager and real estate broker, NAI/James E. Hanson, Inc. ("NAI Hanson"). Paragraph 4 ("Commissions for

A-0708-24

Services Rendered by Broker") of the Commercial Listing Agreement between the Buehler trust and Hanson stated:

> [The trust] agrees to pay [NAI Hanson] for its services to new tenants and <u>not for any existing tenants of [the trust] as to an existing tenant's current space, location and square footage</u> as follows:
>
> > (a) For the lease of space in the [p]roperty to new tenants of or the expansion of existing tenant's current space at the [p]roperty, [NAI Hanson] shall receive a commission based on Schedule B for a lease term ten (10) years as to office tenants and fifteen (15) years as to retail tenants. Provided, however, <u>if there exists an unexpired broker commission agreement applicable to the expansion of an existing tenant's space, [NAI Hanson] shall not receive a commission for the expansion unless [the trust] requests the participation of [NAI Hanson]</u>. For the purposes of this [a]greement "existing tenant" is defined as tenant occupying space in the [p]roperty as of December 1, 2011.
>
> [(Emphasis added).]

This scope of commission was clarified and memorialized by a September 25, 2012 letter stating the trust would pay commissions to Rhein for "lease transactions originated by Rhein and its associated brokers." The letter addressed the PetSmart lease in detail. It stated:

> Pet[Sm]art Second Lease Amendment dated July 26, 2011: Total lease term rent of $6,505,310.00 times 4% commission equaling $260,212.40, payable as follows:

4

a. An initial payment of $85,807.09 (which was paid and received by Rhein) representing one-third (1/3) of the total commission; and

b. The balance of $174,342.31 payable in 24 monthly payments of $7,264.23, commencing April 14, 2012[,] and ending March 15, 2014.

In the event of any future renewals of the lease by Pet[Sm]art, a commission equal to the total renewal lease term rent times 4% commission, with one-third (l/3) payable upon execution of the lease renewal and the balance payable in 24 monthly payments commencing thereafter.

The letter also addressed the Borders/DSW lease in detail:

DSW Shoe Warehouse for the year ending October 31; 2014: Total annual rental income of $901,549 times 5% commission equaling $45,077.45, payable in September 2013. Thereafter, Rhein intends to invoice for a 5% commission of the total annual rental income on an annual basis until such time as the tenancy is terminated. In the event of any future renewals of the lease by DSW Shoe Warehouse, a commission equal to the total renewal annual rental income times 5% commission.

The trust continued to pay commissions to plaintiffs for the leases of the property, including PetSmart and DSW, after Rhein's termination in 2011.

In 2015, the Buehler trust sold the property to PNP pursuant to an "Agreement of Purchase and Sale between the Emil Buehler Perpetual Trust, as Seller and Advance Realty Development, LLC, as Purchaser" ("PNP PSA").

5

A-0708-24

The PNP PSA contained warranties and representations and included a complete listing of all leasing brokerage contracts and amendments. It incorporated the brokerage agreement and all subsequent amendments and correspondence between the trust and Rhein, including future commission schedule letters. PNP and the trust also executed an Assignment and Assumption of Brokerage Agreements, under which PNP assumed all obligations and liabilities arising after the sale, including both DSW and PetSmart leases and related amendments.

Paragraph 18(f) of the PNP PSA specified:

> Purchaser shall pay all commissions due and which will become due on any and all leases and lease renewals, modifications or extensions entered into after the closing date with purchaser's approval, including without limitation any commissions due pursuant to that certain brokerage agreement entered into between Rhein Management Corp and Bueller Inc, dated February 15, 1984[,] as set forth in Exhibit H attached hereto.

Paragraph 18(g) stipulated that: "Purchaser shall be obligated to pay any and all leasing commissions for existing tenants of the property, payable in the event the existing tenants exercise options after the closing date for renewals, extensions, expansion, and modifications under the lease documents."

A-0708-24

The property changed hands again in 2018, when PNP sold it to DEKA pursuant to a "Purchase and Sale Agreement between [PNP], as Seller and [DEKA], as Purchaser" ("DEKA PSA").

Paragraph 4.7 of the DEKA PSA provided that Exhibit 4.7 was a "true, correct, and complete list of all brokerage agreements" relating to the property on the date of sale that PNP assumed when it acquired the property. All relevant documents, correspondences and commission schedules involving Rhein were listed in Exhibit 4.7.

DEKA is the current owner of the property.

i.

The PetSmart Lease

PetSmart's tenancy began in February 1996. The lease provided for an initial term of fifteen years and two five-year renewal options. Paragraph 3.1 defined the lease term to include the "[i]nitial [t]erm and any and all [r]enewal [p]eriods." Paragraph 5 further defined the term "renewal period" as an extension of the lease under the same terms and conditions, "except that the rent payable during each [r]enewal [p]eriod shall be as specified in Article 4" of the lease. The PetSmart lease also provided that upon the failure of PetSmart to exercise a renewal option, "this [l]ease shall terminate as of the then applicable

7

expiration date and neither [l]andlord nor [t]enant shall have any further obligation or liability hereunder arising or continuing from and after the later of such expiration date or the date when [t]enant vacates the [p]remises."

On July 26, 2011, the parties executed a "Second Amendment to Lease," by which PetSmart exercised both renewal options, extending the lease through January 31, 2022. PetSmart also secured two additional five-year renewal options which had the potential to extend the lease term through January 31, 2032. Butler was closely involved in negotiating this transaction.

PetSmart remained as a tenant through both the PNP and DEKA acquisitions. In April 2021, prior to expiration of its amended lease term, PetSmart advised DEKA that it would not exercise its renewal options but expressed an interest in remaining as a tenant if a new rent structure could be agreed on. DEKA, through its broker, began negotiating a new lease.

In October 2021, PetSmart and DEKA entered into a new lease, which combined the two five-year renewal options into a single ten-year term terminating January 31, 2032. The new expiration date was the same as in the second amendment negotiated by Rhein. The rent under the new lease was less than what PetSmart would have paid if it exercised the options under the prior

8

amendment. DEKA did not contact plaintiffs as part of those negotiations. DEKA's broker received a commission for the new lease.

ii.

The DSW Lease

DSW's lease as a tenant began with Borders in the same space in June 1992. The lease provided for an initial term of ten years with four five-year renewal options. Section 1.6 identified "Stu Sherer, Equity Realty, Paramus, New Jersey" as the only involved broker. Paragraph 14.8 further stated that "each of the parties represents and warrants to the other that there are no claims for brokerage commissions or finders' fees in connection with the execution of this [l]ease, other than to the party identified in Section 1.6." While Rhein was not named, testimony established it was paid commissions for the Borders lease and subsequent assignments.

In March 1995, Borders executed a first amendment, confirming expiration of the initial term on October 31, 2003. Subsequently, Borders entered into a sublease with Shonac Corporation, which assigned its rights to Wilkerson Shoe Co., later renamed DSW.

In July 2010, Borders, the Buehler trust, and DSW entered into an Assignment and Assumption of Lease, by which DSW succeeded Borders'

A-0708-24

rights, including renewal options and commission obligations. In a second amendment executed the same month, the lease term was extended to October 31, 2019, and provided for two additional five-year renewal options, with the potential lease term to end on October 31, 2029.

Prior to expiration of the lease in 2016, DSW informed PNP it would not exercise the renewal options under the July 2010 second amendment. PNP and DSW negotiated a third amendment to the lease whereby the two five-year options were replaced with a single 10-year term at reduced rent, with the same ultimate termination date of October 31, 2029. PNP did not contact Rhein during these negotiations.

iii.

Litigation and Trial

In April and July 2018, Rhein emailed PNP inquiring about the renewal status of these leases. Rhein requested confirmation of PNP's assumption of responsibility in relaying the payment of brokerage fees to Rhein for the renewal of tenancies that originated with them. PNP did not respond.

Plaintiffs filed suit against PNP and DEKA in August 2021 seeking unpaid brokerage commissions for the DSW and PetSmart tenancies. The matter proceeded to a three-day bench trial in April and May 2024.

10

A-0708-24

In July 2024, the trial court found both PNP and DEKA affirmatively assumed the obligation to pay plaintiffs' commissions. Interpreting the express language of the various agreements, the trial court found the PSAs and their corresponding assignment contracts required payment of plaintiffs' commissions for existing tenants, not only on formal lease renewals but also on lease modifications and extensions. The trial court entered judgment for plaintiffs in October 2024, ordering payment of commissions on both the PetSmart and DSW leases: $399,990 for PetSmart and $311,994 for DSW.

Defendants appealed.

## II.

"Final determinations made by the trial court in a non-jury case are subject to a limited and well-established scope of review." D'Agostino v. Maldonado, 216 N.J. 168 (2013) (quoting Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011)). We "give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions." Allstate Ins. Co. v. Northfield Med. Ctr., P.C., 228 N.J. 596, 619 (2017) (quoting Griepenberg v. Twp. of Ocean, 220 N.J. 239, 254 (2015)). "[D]eference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" C.R. v. M.T., 257 N.J. 126, 139 (2024). "That is so

11

because an appellate court's review of a cold record is no substitute for the trial court's opportunity to hear and see the witnesses who testified on the stand." Balducci v. Cige, 240 N.J. 574, 595 (2020).

We defer to the trial court's factual findings, which are binding on appeal when they are supported by adequate, substantial, credible evidence. C.R., 257 N.J. at 139. We "may not overturn the trial court's fact findings unless [it concludes] that those findings are 'manifestly unsupported' by the 'reasonably credible evidence' in the record." Balducci, 240 N.J. at 595 (quoting Seidman, 205 N.J. at 169).

Conclusions of law, however, are owed no deference and are reviewed de novo. State v. Zingis, 259 N.J. 1, 14 (2024). Issues involving contract interpretation are considered questions of law, requiring we "look at the contract with fresh eyes." Del. River Joint Toll Bridge Comm'n v. George Harms Const. Co., Inc., 258 N.J. 286, 303 (2024).

### III.

As a threshold matter, defendants argue the trial court committed error by proceeding with a bench trial after plaintiffs failed to comply with Rule 4:25-7(b). Defendants objected to plaintiffs' failure to provide a detailed list of trial exhibits prior to trial, arguing this amounted to a "trial by ambush" and sought

12

dismissal or sanctions. Defendants contend they were prejudiced by this lack of disclosure, and assert the trial court should have imposed remedies such as adjournment, limiting testimony, or even dismissing the case, instead of commencing trial. We are unpersuaded.

We review the trial court's application of Rule 4:25-7 de novo. DiFiore v. Pezic, 254 N.J. 212, 228 (2023) ("[W]e review the meaning or scope of a court rule de novo, applying 'ordinary principles of statutory construction to interpret the court rules.'" (quoting State v. Robinson, 229 N.J. 44, 67 (2017))). Rule 4:25-7(b) provides "in cases that have not been pretried, attorneys shall confer and, seven days prior to the initial trial date, exchange the pretrial information as prescribed by Appendix XXIII to these rules."

Subsection (b) specifically states:

> At trial and prior to opening statements, the parties shall submit to the court the following in writing: (1) copies of any [p]retrial [i]nformation [e]xchange materials that have been exchanged pursuant to this rule, and any objections made thereto; and (2) stipulations reached on contested procedural, evidentiary, and substantive issues.

The trial judge found that while there was no "formal pre[]trial exchange or traditional pre[]trial exchange in terms of documents stamped and marked," the documents which plaintiffs intended to rely upon had been provided during

13

the course of discovery, and no evidence suggested they would be a surprise. The trial judge further found "in this case [ ] plaintiff[s] ha[ve] indicated the documents [they] intend[] to rely on," and defendants had not filed any in limine motions to preclude admission of those documents. Further, concerning the documentary exchange, the trial transcript reflects the judge considered the scope of anticipated evidence, namely that documents were already exchanged in discovery, the age of the case, and the "indulgences" given to each side with regard to "timing, etcetera."

The court gave the parties an hour to collaborate and exchange any documents they intended to use at trial. Defendants did not object. The trial court then determined the proper remedy was to proceed with trial without further delay. Our de novo review of the record leads us to conclude that the trial court did not commit error by proceeding to a bench trial.

We turn to the merits.

### A.

Defendants argue Rhein was not entitled to commissions from either PNP or DEKA because they did not affirmatively assume the obligation to pay Rhein's brokerage commissions. Defendants contend the obligation to pay a brokerage commission cannot be imposed on a purchaser "unless the purchaser

14

affirmatively assumes that obligation."  Citing to <u>VRG Corp. v. GKN Realty Corp.</u>, 135 N.J. 539 (1994), and <u>Pagano Co. v. 48 S. Franklin Turnpike, LLC</u>, 198 N.J. 107 (2009), they argue that "a broker seeking a commission from a successor property owner must prove entitlement under a brokerage contract and that the successor owner 'affirmatively assumed' the prior owner's obligation under the brokerage contract."  Defendants further argue to establish affirmative assumption, PNP or DEKA "must have had actual knowledge" of their specific obligations under the brokerage agreement and had to have "knowingly taken an assignment" thereof.  It is defendants' position that such assumption did not occur in this case.  We are unconvinced.

A plaintiff seeking to recover a broker's commission must prove that

> [s]he was the "efficient producing cause" in bringing about the sale -- at least in the sense of causing the seller to negotiate with a customer, produced by the broker, who is ready, able and willing to perform, and where the transaction is later consummated without a substantial break in the ensuing negotiations.
>
> [<u>Fry v. Doyle</u>, 167 N.J. Super. 486, 493-94 (App. Div. 1979); <u>De Benedictis v. Gerechoff</u>, 134 N.J. Super. 238, 242 (App. Div. 1975).]

Additionally, it is well-settled that "when property is sold subject to a lease, there is no obligation on the purchaser's part to pay the broker, unless the purchaser affirmatively assumes that obligation."  <u>VRG Corp.,</u> 135 N.J. at 556.

15

The 2012 correspondence memorializing the agreed upon terms establishes plaintiffs procured DSW and PetSmart as tenants, entitling plaintiffs to brokerage commissions. It follows that the next question to be resolved is whether the brokerage agreement was affirmatively assumed by defendants. We consider the Supreme Court's guidance on how to analyze that question.

> [D]etermining whether an "affirmative assumption" has taken place requires an analysis of all of the facts and circumstances surrounding the assignment and, in particular, the documentary record. If, taken as a whole, the record signals that the assignee agreed to assume the obligation, he or she will be held to it despite the absence of a separate express promise to do so.
>
> [Pagano, 198 N.J. at 109.]

Here, guided by Pagano, the trial judge found:

> [B]ased upon the PSAs, the Assignment and Assumption of Brokerage Agreement document, and the testimony at trial, both PNP and [DEKA] clearly affirmatively assumed the brokerage agreements and those documents expressly referenced Rhein.
>     . . . .
>
> The record in this matter . . . is replete with references to both the leases and the brokerage commissions due to plaintiffs under those leases. Both PNP and [DEKA] accepted assignment of the leases as part of their purchase and sale agreements, which expressly referred to an[d] incorporate[d] the obligation to pay commissions to plaintiffs under the leases. Therefore[,] it is clear that PNP affirmatively assumed the brokerage

16

agreements not only pursuant to the leases it assumed, but also by virtue of the assignment of brokerage agreement document which clearly provides that PNP expressly assumed the obligations of the trust with respect to the brokerage agreements set forth on the schedule annexed to that document.

As to [DEKA], although there was no evidence that an assignment and assumption of brokerage agreement was executed between PNP and [DEKA], [DEKA] accepted assignment of the leases and the [DEKA] PSA expressly references a broker's commission due to plaintiffs in paragraph 4.7 along with exhibit 4.7 to the PSA which was the list of brokerage agreements and related documents with regard to plaintiff's commission.

Defendants['] position that they were not provided with information regarding a brokerage agreement and therefore not obligated for same lacks both merit and credibility.

In Pagano, a broker procured a tenant to lease space in a commercial building. 198 N.J. at 110. The lease stated

[l]essor represents and warrants to [l]essee that [l]essor dealt exclusively with Pagano Company and that by separate commission agreement and letter of understanding, said broker shall be paid a commission by [l]essor. In consideration of the foregoing, [l]essor agrees to fully satisfy his obligations to said broker for commissions.

[Id. at 118.]

The property was then sold with the buyer assuming the lease. Id. at 111. The transfer assigned "leases . . . and other agreements of whatever form . . . affecting all or any part of the Property[,]" to the buyer. Ibid. However, the broker's commission was not paid prior to the sale, so the broker sued to recover the commission from the buyer. Id. at 112. The buyer claimed they did not assume the obligation to pay the broker's commission. Id. at 112.

The Supreme Court held that: (1) the leases assigned to the buyer referenced the commission, (2) the leases identified the broker as procuring the tenant, and (3) the buyer "assume[d] and agree[d] to perform all of [the seller's] obligations under the [l]eases." Id. at 118. The Court recognized that the buyer was "a sophisticated purchaser of commercial property, [and] had a fair opportunity to request access to the [broker agreement], or at least to register any concerns caused by the foregoing promises before agreeing to the assignment." Ibid. Therefore, the buyer "accepted a general assignment of leases that specifically referred to the commission obligation between [the broker] and the [seller]. In short, this record bespeaks an affirmative assumption." Id. at 119.

Considering the record before us, we discern nothing which would cause us to reach a conclusion different from the one reached by the Pagano Court.

After considering the terms of the PSA documents, including their corresponding assumptions, the trial court correctly found defendants affirmatively assumed the brokerage agreement between plaintiffs and the trust. We disagree with defendants' argument that "the positions asserted by [DEKA] and PNP are completely consistent with VRG [Corp., 135 N.J. at 539] and Pagano, [198 N.J. at 107]." In Pagano, the agreements expressly identified Pagano as the broker who procured the tenant. 198 N.J. at 118. Here, while the agreements did not expressly identify Rhein as the broker, they incorporated, via exhibit, correspondence between the trust and Rhein acknowledging Rhein's role in arrangement of the tenancies. This is a distinction without a difference.

We are unpersuaded by defendants' argument that they did not have actual knowledge of the trust's obligation under the brokerage agreement. Defendants conceded they had knowledge of the brokerage agreement and the leases at issue, stating: "[t]he trial court found that PNP and [DEKA] had knowledge of the [b]rokerage [a]greement and the DSW and PetSmart leases. That much is true, but beside the point." We disagree. Defendants' knowledge of the brokerage agreement and the leases is precisely the point. "As a general rule, 'one who does not choose to read a contract before signing it cannot later relieve himself of its burdens.'" Skuse v. Pfizer, Inc., 244 N.J. 30, 54 (2020) (quoting

<u>Riverside Chiropractic Grp. v. Mercury Ins. Co.</u>, 404 N.J. Super. 228, 238 (App. Div. 2008)).

The brokerage agreement, the leases, and the PSAs, read together, support a finding that defendants assumed the commission obligation. Defendants, sophisticated purchasers of commercial property, had a full and fair opportunity to perform their due diligence before purchasing the property, including conducting a full review of the unambiguous terms contained in the agreements and their related exhibits.

We conclude that the trial court properly found defendants affirmatively assumed the obligations set forth in the trust's brokerage agreement and discern no error.

B.

Defendants advance two arguments against the trial court's award of brokerage commissions to support its theory that the new leases contained certain terms which were different from the leases which conferred plaintiff's right to receive them: first, DSW and PetSmart did not elect to renew their lease and instead opted for new terms; and second, only the "renewal" language in the previous agreements afforded plaintiffs commissions, and, with new terms

agreed upon, a renewal did not occur. We reject these arguments for the following reasons.

i.

Defendants first argue that both PetSmart and DSW expressly declined to exercise their renewal options, instead negotiating new leases with different rents and terms. Defendants contend these changes, specifically in term and rental price, render the leases new and fundamentally distinct from any "renewal," and therefore negate Rhein's commission entitlement. We are unpersuaded.

We consider the relevant law.

"To establish a claim for breach of contract, a plaintiff must provide proof of 'a valid contract between the parties, the opposing party's failure to perform a defined obligation under the contract, and a breach causing the claimant to sustain[ ] damages.'" Nelson v. Elizabeth Bd. of Educ., 466 N.J. Super. 325, 342 (App. Div. 2021) (alteration in original) (quoting EnviroFinance Grp., LLC v. Env't Barrier Co., 466 N.J. Super. 325, 345 (App. Div. 2015)). Plaintiffs bear the burden of proving each element by a preponderance of the evidence. Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016).

A-0708-24

It is well settled that "'[w]hen a broker[,] who had been duly authorized by the owner to find a buyer for his property[,] produced a willing and able purchaser who entered into a contract to buy on terms agreeable to the owner, the broker has fulfilled his undertaking' and is entitled to a commission." Pollack v. Quick Quality Rests., Inc., 452 N.J. Super. 174, 188 (App. Div. 2017) (second and third alterations in original) (quoting Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528, 543 (1967)). "The broker need take no part in negotiations" nor "even be an influential factor in persuading the customer to accept the terms" to be entitled to compensation. First New Hampshire Corp. v. Van Syckle, 37 N.J. Super. 469, 471-72 (App. Div. 1955) (internal citations omitted). "But where the broker presents a prospective buyer and, on that basis, negotiations ensue, even though the broker takes no part in them, and a sale results, then ordinarily the broker is considered to be the efficient cause" thus entitling him to commissions. Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 754 (1989) (quoting Weinstein v. Clementsen, 20 N.J. Super. 367, 372 (App. Div. 1952)).

In construing a contract, a court first must make the determination of whether the contractual term at issue is clear or ambiguous. Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 616 (2020). Where the terms of a contract

22

are clear, the court must enforce the contract as written and ascertain the intention of the parties based upon the language. Id. at 616 (citing In re Cnty. of Atlantic, 230 N.J. 237, 254 (2017)). Intent is not defined by the subjective expectations of the parties. Lederman v. Prudential Life Ins. Co. of Am., 385 N.J. Super. 324, 340 (App. Div. 2006). It is "revealed by the language [of the contract]." Globe Motor, 225 N.J. at 483. "[W]ords and phrases are not to be isolated but [instead should be] related to the context and the contractual scheme as a whole, and given the meaning that comports with the probable intent and purpose." Boyle v. Huff, 257 N.J. 468, 478 (2024) (quoting Newark Publishers' Ass'n v. Newark Typographical Union, 22 N.J. 419, 426 (1956)).

Turning to the facts at hand, we have held that a broker's commission is earned when the broker produces a tenant with the potential for ongoing occupancy, regardless of whether the new lease's terms mirrored those of the original. Archie Schwartz Co. v. Albert & John Frassetto Dev. Co., 280 N.J. Super. 43, 46 (App. Div. 1995). In Archie Schwartz Co., a real estate broker sought a commission from the landlord for a new lease entered into with the same tenant following the expiration of the original 10-year term. Id. at 45. The new lease differed from the previous one in four ways: (1) the rented space was increased; (2) substantial construction and tenant fit-ups were agreed upon; (3)

the rent was increased; and (4) the new lease omitted the renewal option present in the original lease. Id. at 46. In seeking recovery, the broker relied on a 1979 commission agreement which obligated the landlord to pay a 5% commission if the tenant renewed, extended, took additional space, or purchased the property. Ibid.

Although the trial judge initially denied recovery, reasoning that the new lease was not a renewal nor extension due to the substantial changes, we reversed and awarded broker commissions. Id. at 45-47. We held the broker's commission was earned by producing a tenant with the potential for ongoing occupancy, regardless of whether the new lease's terms mirrored those of the original. Id. at 46. We concluded the parties intended for the broker to receive commissions as long as the tenant continued its relationship with the landlord, even under a new lease with changed terms. Id. at 47.

Applying this analytical framework to the 2016 DSW lease amendment and 2021 PetSmart lease, we conclude the parties did not intend to limit the broker's right to commission only to formal exercises of renewal options. Rhein's services — bringing parties together and establishing the initial tenancy, entitled them to commissions for as long as the tenants remained in occupancy, including under any new or amended leases. See id. at 47. Any other conclusion

24

would permit property owners to deny brokers their commission merely by "entering into a new contract with the buyer or lessee cancelling the contract resulting from the services or efforts of the agent, and entering into a contract of sale or lease for a different price or commission." Louis Ross Assocs. v. Interstate Holding Corp., 249 N.J. Super. 436, 439 (App. Div. 1991).

For these reasons, the trial court did not err when it held Rhein was entitled to commissions under the new PetSmart and the amended DSW lease.

ii.

Defendants next argue the trial court erred in interpreting "renewal" as an "umbrella term" that "meant to encompass any and all leases, modifications, renewals, or extensions" rather than the specific act of exercising a contractual renewal option. They claim the term "renewal," as used in the brokerage agreement, refers exclusively to a tenant exercising its contractual option to renew the lease. They contend the court was therefore incorrect in holding that Rhein was entitled to a commission since DSW and PetSmart did not execute the renewal option. We disagree.

We first consider the definitions of two terms, renewal and extension. Black's Law Dictionary defines "renewal" as a "recreation of a legal relationship or the replacement of an old contact with a new contract, as opposed to the mere

25

extension of a previous relationship or contract." Black's Law Dictionary, 1554 (12th ed. 2024).  In contrast, Black's defines the term "extension" as "[t]he continuation of a contract for a specified period beyond its originally stipulated duration."  Id. at 726.

We turn to the record.  Rhein produced a substantial rent-paying tenant which maintained a continuous relationship with the landlord from 1996 forward – first with the trust, and afterwards, with defendants.  The 2021 PetSmart lease recreated the then-existing landlord-tenant relationship between PetSmart and DEKA and can be characterized as a renewal.

The DSW lease was a third amendment to the original 1992 lease.  By its operative language, the amendment stated:

> [T]he Lease Term is hereby extended for a period of one hundred twenty (120) full calendar months, commencing on November 1, 2019[,] and continuing thereafter through and including October 31, 2029 (the "Second Extended Term").  All terms, covenants and conditions applicable to the Lease Term and all assignments, modifications and assignments to the Lease will be equally applicable to the Second Extended Terms, except as hereinafter modified.
>
> [(Emphasis added).]

This amendment effectively continued the original 1992 lease for another ten years.  Therefore, as defined, we conclude it is an extension.

26

Our reading of the payment terms of the brokerage agreement leads us to conclude that its terms are clear, and not ambiguous. The brokerage agreement expressly contemplated that Rhein would be entitled to a commission if the tenant either exercised a renewal option or otherwise extended the lease. That is what transpired. We are not persuaded by defendants' restrictive interpretation of the term "renewal," and conclude that the trial court properly found plaintiffs were entitled to the commissions from the 2016 DSW Lease amendment and the 2021 PetSmart lease.

## C.

Finally, defendants argue that the trial court committed error when it awarded plaintiffs a 6% commission, rather than a 4% commission, based on Butler's testimony, rather than relying on the clear terms of the correspondence in the record. We agree.

It is well-settled that where the contract terms are clear, we shall enforce the contract as written and ascertain the intention of the parties based upon the language. Barila, 241 N.J. at 616. The terms of the September 2012 email to Butler, part of the written communications which give her the right to recover commissions, are quite clear: "[i]n the event of any future renewals of the lease

A-0708-24

by Pet[Sm]art, a commission equal to the total renewal lease term rent times 4% commission."

The record shows that Butler agreed with the brokerage commission schedule in her October 2012 response email, stating, "Please be advised that I agree with the brokerage commission schedule as outlined in the 09/25/12 letter received via email from Peter Thompson of Wells Fargo except with regard to the commission due for the lease with DSW Shoe Warehouse." Given the clear language of the September and October 2012 emails, the trial court improperly admitted Butler's testimony to arrive at the incorrect 6% commission. The court should have calculated PetSmart lease commissions at a rate of 4%.

We affirm the trial court's order awarding plaintiffs brokerage commissions. We reverse the trial court's order awarding 6% commission as to the PetSmart lease. We remand to the trial court for recalculation of the PetSmart lease commission and entry of an amended order of judgment.

Any of defendants' remaining claims not addressed here lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part, reversed in part and remanded for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

28

A-0708-24